## ADEE *vs.* DEMOREST & SIMONS.

A referee found, as matter of fact, that the plaintiff, on the 2d of July, 1864, shipped to the defendants 3880 bushels of oats, the property of the plaintiff; that the defendants received the oats, sold them for $3225.67, after deducting charges and commissions, and refused, upon demand, to pay such proceeds to the plaintiff; *Held* that this made out a clear cause of action, and warranted a conclusion of law that the plaintiff was entitled to recover.

*Held, also,* that the plaintiff having given evidence tending to show that the oats in question were his property, and the defendants having given evidence tending to disprove the plaintiff's case, and to show that the oats belonged to them, and to make out a defense to the action; and the referee having believed the plaintiff's witnesses, and found in his favor upon the facts, and thus by implication negatived the defense; the report in favor of the plaintiff was not only an express finding, upon the facts, in his favor, but was in legal effect a finding against the defendants, that the defense was not established, and that no *facts* were proved by them which warranted a finding in their favor, upon the whole issue.

Before the court can reverse a judgment rendered by the referee, in such a case, it must, upon a review of the testimony, come to the conclusion that his finding upon the facts is against the clear weight of the evidence, precisely as it would hold—if the case had been tried by a jury, and their verdict, upon the same facts, was for the plaintiff—that such verdict was not warranted by the evidence.

The plaintiff having proved that the precise quantity of oats mentioned in the report had been delivered by him at the warehouse of H., the shipper, at or before the time of the shipment of such oats, and he producing the shipping

Adee *v.* Demorest.

bill of said oats, signed by H., showing the shipment of that quantity of oats on board a canal boat owned by H. and others, for and on account of the plaintiff's consignee, to the care of the defendants; *Held* that these facts clearly established, *prima facie*, at least, that the oats in question were the property of the plaintiff and had been received by the defendants as his consignees, or for his use and benefit.

Of these oats the defendant proved that 1253 bushels were not in fact the identical oats delivered by the plaintiff to H. and placed in store in his warehouse, but were in fact other oats purchased by W. with money obtained upon drafts drawn by him on the defendants. *Held* that upon the proofs the referee was warranted in finding that 1253 bushels of the plaintiff's oats were lent to W. and used by him; and that of the oats shipped to the defendants the same number of bushels were received and taken from W.'s oats in return for, or repayment of, the oats so lent.

That upon these facts there was no reasonable ground of doubt that H. & W. were jointly interested in the operation of buying and shipping oats, and that H. did, therefore, in borrowing and paying oats, in their common business and for their common benefit, bind both parties.

That H. therefore might lawfully, with W.'s assent, pay these 1253 bushels of oats to the plaintiff, and might lawfully ship them for him, and give and make a bill of lading, or shipping bill, in the name of the plaintiff. And that the referee might find that such were the facts, and such the true transaction.

Oats were purchased by W. from various persons, under an agreement between him and the defendants that such oats should be consigned to the latter; they were paid for by drafts drawn upon the defendants; but there was no agreement for a lien by the defendants upon the property to be purchased by W., or that the title should be in them from the time of the purchase. *Held* that the defendants had no title to the oats so purchased, and no lien thereon, until they were consigned to them by W.

Until consignment, in such a case, the lien of the consignee does not attach.

Upon a judgment rendered by a referee, or a single judge, the court reviews the facts as well as the law, and upon the same principles which govern the review of the verdict of a jury. *Per* E. D. SMITH, J.

APPEAL by the defendants from a judgment entered upon the report of a referee.

The complaint in this action alleges that on the 2d day of July, 1864, at Starkey, Yates county, the plaintiff shipped on board the canal boat Joseph Carley, then lying in the Seneca lake, 3880 bushels of oats, the property of the plaintiff, to the plaintiff at New York, to the care of the defendants, by the firm name of Demorest & Simons,

32 Moore street, they being commission merchants. That said oats so sent were received by the defendants, and by them sold at one dollar per bushel, amounting to 3880 dollars. That the plaintiff had demanded the money of the defendants, who refused to pay the same or any part thereof to the plaintiff, and had converted the same to their own use. Judgment for $3880 was demanded, with interest from the 15th of July, 1864, and costs.

The defendants by their answer allege that the defendants in 1863 and 1864 did business with George W. Wilmot, of Starkey, receiving from him shipments of grain, &c., and making advances on such shipments. That in the course of the business Wilmot became, and, at the time mentioned in the complaint, was largely indebted to the defendants for advances on the faith of grain to be shipped to them. That M. A. Hollister, wife of A. Hollister, was interested with Wilmot as partner in some of the shipments and liable with him for a part of said indebtedness, and in a sum exceeding the value of said grain mentioned in the complaint. That before the time mentioned in the complaint, and about the forepart of June, 1864, Wilmot, individually, or as partner with Mrs. Hollister, owned and had in his possession the oats mentioned, and promised the defendants to ship the oats to them; the proceeds to be applied on said indebtedness. That the oats, at the time and place mentioned in the complaint, on the boat Carley, (being the boat of Wilmot,) were, by the procurement of Wilmot, shipped and transported to New York, as stated in the complaint, and received by the defendants as the oats of Wilmot, individually, or as partner as aforesaid, to be sold, and the proceeds applied as aforesaid. That the oats were the property of Wilmot, individually or as partner, and were not at any time or place the property of the plaintiff. That on the receipt of said oats, pursuant to the authority of Wilmot, the defendants sold the oats at one dollar per bushel. The proceeds were

$3525.67, after deducting the charges and commissions, and thereupon, pursuant to like authority of Wilmot, the proceeds have been rightfully retained by the defendants to apply on said indebtedness. The defendants admit that they refused to pay the proceeds to the plaintiff upon his demand.

The action was referred to S. H. Welles, referee, to hear and decide, and was brought to a hearing on the 23d day of August, 1865.

On the trial the shipping bill was introduced and proven on the part of the plaintiff. It was as follows:

"Shipped, Starkey, July 2, 1864, on boat Joseph Carley, Capt. H. Wilmot,

|  |  |
|---|---|
| HORACE ADEE,<br>　　New York.<br>Care Messrs.<br>　　Demorest & Simons,<br>　　　32 Moore St., N. Y. | Thirty-eight hundred<br>and eighty bus. Oats.<br>3880.　　124,160 lbs.<br>Capt. collect seven<br>and a half cents (7½c.)<br>fr't. and insurance,<br>$291.00.<br>HORACE ADEE,<br>　　Per Hollister." |

It was proved that A. Hollister, in 1863 and 1864, was engaged in the commission and forwarding business; that the plaintiff had the oats specified in the shipping bill (3880 bushels, 6 lbs.,) in his warehouse at Starkey. A part of the oats were in the warehouse on the 10th of March, 1864, and part not. 1253 12-32 bushels were in the warehouse the year previous and were lent to Wilmot. That the 1253 bushels were returned by Wilmot at the time of shipping the oats, 2d July, 1864, and the 3880 bushels were shipped by Hollister for the plaintiff on board of the boat Joseph Carley, for the plaintiff. It also appeared in evidence that Hollister & Wilmot were owners of the boat upon which the oats were shipped. The referee, after hearing the proofs and allegations of the parties,

duly made and signed his report, in and by which he found: 1st. That the defendants were partners as commission merchants in New York, in 1864. 2d. That on the 2d of July, 1864, the plaintiff, at Starkey, shipped on board the canal boat Joseph Carley 3880 bushels of oats, the property of the plaintiff, directed to the plaintiff, to the care of the defendants. That the oats were received by the defendants about the 23d of July, 1864. 3d. That the defendants sold said oats about the 1st of August, 1864, and received $3525.67, after deducting their charges. 4th. That after such sale the plaintiff demanded of the defendants the proceeds, and the defendants refused to deliver the same.

As a conclusion of law, the referee found and decided: That the defendants were indebted to the plaintiff in the sum of $3525.67, with the interest thereon from the 1st of August, 1864, amounting at the date of his report to $267.32, and that the plaintiff was entitled to judgment against the defendants for $3792.99, besides costs. Upon which said report judgment was duly entered for damages $3792.99, and $138.95 costs.

The defendants made a case containing exceptions, and appealed to the general term from said judgment.

*E. P. Hart,* for the appellants. I. The referee finds as a fact, that the plaintiff, on the 2d day of July, 1864, shipped on board of the boat Carley 3880 bushels of oats, and that the same was the property of the plaintiff. It is submitted that there is no proof to warrant or justify this finding. 1. It is and must be conceded that the 1253 bushels of oats delivered in the fall of 1862, and which amount was included in the 3880, had been disposed of for over a year before the shipment in question. Adee had no title to this quantity of the oats, unless the arrangement with Hollister conferred such title, and we propose to show hereafter that it did not, either in point

of fact or law.   2. As to the oats delivered in the fall of 1863, and forepart of the year 1864, it is alike conceded that these oats were all disposed of by Hollister, on his own account, in January and February, 1864, except 600 or 700 bushels.   The quantity of oats then delivered was 2627 bushels.   How then did Adee get title to the 2000 bushels which had been taken away—converted by Hollister?   Hollister does not pretend that he had any authority from Adee to sell those oats to the government.   Upon the proof it is an unmitigated conversion by him of the plaintiff's grain, and it is patent and apparent from the whole case, that to excuse himself from liability to the plaintiff (assuming that there was no collusion between the two) he appropriated the defendant's grain to his own use, by turning the same over to the plaintiff.   It is not pretended that Hollister owned this grain with which he made the substitution, nor is it alleged or proved that any arrangement was made between them, or that Wilmot was ever consulted, or consented to the taking 2000 bushels of oats out of the load in payment for those which Hollister had sold to the government, and which were drawn to his warehouse by the plaintiff.   There is not a particle of proof to show that the plaintiff owned or had title to the 2000 bushels of oats thus changed or substituted by Hollister.   A summary of the facts, or the evidence in detail, shows the transaction to be:

That in the fall of the year 1863 the plaintiff delivered, or caused to be delivered, at the warehouse of Hollister's wife, at Starkey, 2627 bushels of oats.   They were soon after converted by Hollister.   Subsequent to such conversion, Wilmot brings and stores in the same warehouse a large quantity of oats, so that on the 2d day of July, 1864, 3100 bushels remain there.   It is then resolved by Wilmot to send a cargo of oats to the defendants, to enable them to meet their large acceptances to raise money to purchase this grain.   The boat is then sent to Shingle

Adee *v.* Demorest.

Point, Lodi, North Hector, Peach Orchard, Watkins, Big Stream, and finally brings up at Starkey and completes the load, making an aggregate of 10,541 bushels. By a single dash of his pen, Hollister attempts to transfer to the plaintiff 3880 bushels, undistinguished of this cargo, although he knew that the defendants had accepted drafts upon the faith of this consignment. He had used the proceeds himself, and, in fact, but two or three days before commencing the loading of those oats, he discounted at Stafford's Bank, at Dundee, Wilmot's draft of $2000, accepted by the defendants, and which they subsequently had to pay, and the plaintiff himself received $1450, part of the proceeds of the draft. Upon this state of facts, we submit that it is unwarrantable to find that this plaintiff was the owner of the oats, beyond the 600 or 700 bushels.

3. The evidence is wholly insufficient to authorize the finding that the 1253 bushels belonged to the plaintiff. Assuming all that Hollister states to be true, it fails to show a transfer of title from Wilmot to the plaintiff. Hollister swears that about the time that the boat was being loaded, he spoke to Wilmot about returning the Adee oats. Wilmot replied: "They are ready." This is all the conversation on the subject, all that Wilmot ever said. In what manner do these words indicate a sale or transfer of 1253 bushels of oats, belonging to Wilmot, to the plaintiff? or where was the grain which was to be transferred? Was it at Shingle Point, or at either of the other places along the lake? Was there any consent or direction by Wilmot, that any part of the oats put on this boat (Carley) should be used in the repayment of oats which Hollister pretends were borrowed? Upon this proof, or rather no proof at all, the referee should have found that this 1253 bushels of oats did not belong to the plaintiff, and more especially as Wilmot did not concur in the story of Hollister.

II. For the purposes of this case it must be assumed

that in the year 1862 an agreement was made between Wilmot and the defendants, by which the defendants agreed to accept Wilmot's drafts; that with the proceeds of these drafts Wilmot was to purchase grain and ship the same to the defendants; that at maturity the drafts were to be paid by the defendants; that, relying upon this agreement, and the performance thereof by Wilmot, they did accept drafts to a very large amount. The defendants, upon the trial, offered to prove these facts, the proof of which was excluded by the referee. 1. We insist that under the proof given, and that offered, the title to the oats, when bought by Wilmot, was in the defendants; that Wilmot is to be regarded as acting, in the purchase, as the agent of the defendants, and being the owner, Hollister had not the right to transfer the title to another, particularly when he swears that he had no interest in the grain shipped, and that neither he nor his wife was at this time connected in business with Wilmot. It was entirely competent for the defendants and Wilmot to agree that drafts should be accepted by the defendants, the proceeds of which should be used in the purchase of grain, and that as an indemnity for such indorsements and the payment of the drafts, the grain should be shipped to the defendants. The defendants, under such an agreement, have something more than a mere lien. They are the owners against all persons except *bona fide* purchasers, and have such a vested interest as authorizes them to maintain an action for a conversion. (*Haille* v. *Smith*, 1 *Bos. & Pul.* 563. *Bryans* v. *Nix*, 4 *Mees. & Wels.* 775. *Dows* v. *Cobb*, 12 *Barb.* 310. *Adams* v. *Bissell*, 28 *id.* 382. *Grosvenor* v. *Phillips*, 2 *Hill*, 147. *Feize* v. *Wray*, 3 *East*, 93.) 2. Every consignee or factor has a lien on, or property in, the goods shipped, to the extent of his advances, and the moment the goods are placed on board, the lien on property attaches. (*Brown* v. *Hodgson*, 2 *Camp.* 36. *Stanton* v. *Eager*, 16 *Pick.* 467.) Especially when advances have

Adee *v.* Demorest.

already been made, under an arrangement that property shall be consigned. This proposition does not conflict with the rule that a factor has only a lien upon goods that come into his possession, which rule is laid down by elementary writers, and referred to in the case of the *Bank of Rochester* v. *Jones*, (4 *N. Y. Rep.* 497.) In the case cited, Jones had a balance against Foster for advances on prior consignments, and sought to hold the property as an indemnity for such balance. Foster, at the time of the shipment, drew a draft upon Jones against the grain shipped. Jones refused to accept it. No bill of lading had been sent to Jones. Upon such refusal the consignor, upon the bill of lading, obtained an advance from the Rochester bank, and the bank brought an action of trover against Jones for the conversion. The court held that Jones' right to the possession of the property depended upon his acceptance of the draft. That as he had refused to accept, and no bill of lading being sent to him by Foster, he had no right to the property as against the bank, who had advanced money upon the bill of lading, and the bank was to be regarded as a *bona fide* purchaser. That the possession of Jones was illegal and wrongful. But the court say, on page 500: "But as such receipt or bill of lading was neither sent or delivered to him by Foster, he acquired no title to the property, nor any right to receive or sell the same. There was no agreement existing between Foster and Jones which obligated the former to send all of his flour to the latter, to be sold by him for the reimbursement of his advances made on the credit of flour, to be consigned to him by Foster." The rule for which we contend is thus recognized, that such an agreement as we proposed to prove in this case, obligated Wilmot to send his grain to the defendants to enable them to reimburse themselves for their advances. And it is this feature of the case at bar, that distinguishes it from the case and rule claimed by the plaintiff. 3. The acceptances and payment

of drafts by the defendants upon the faith of property to be consigned to them, not only gave them a vested right to the property, but changed their relations to Wilmot and their remedy against him. In such a case the defendants are not regarded as accommodation acceptors for Wilmot; the proceeds of the sales of the property received by them is the primary fund for their reimbursement, for their acceptances and payments, and they have no remedy against Wilmot, until they show that the proceeds of the property were insufficient to reimburse them. (*Gihon* v. *Stanton*, 9 *N. Y. Rep.* 476. *Mottram* v. *Mills*, 2 *Sandf.* 189.) Now if these oats were owned by Wilmot, that is, those put on at Starkey and sent by Wilmot, in the usual course of business, to the defendants, Wilmot has the right to require the proceeds of the sales to be applied upon the drafts. In fact it was the legal duty of the defendants so to do, unless Wilmot consented to the arrangement made by Hollister, of which there is no pretense. Upon the delivery of the oats to Wilmot the defendants became liable to Wilmot for their value, and being liable to him, most certainly they are not liable to the plaintiff. The plaintiff's remedy is against Hollister for the conversion of his oats, and it is not admissible to allow Hollister to dispose of other men's property to pay his own liabilities. 4. The claim in this case, that because the oats were shipped in Adee's name, the defendants could have no right of sale, is untenable, for the reasons: (*a*) There is nothing in the case to show that the defendants had any knowledge of the manner of shipment. No bill of lading was sent them, or any information apprising them that any part of the cargo belonged to Adee. Hollister swears that but one shipping bill was made out, and that was given to the captain of the boat, Wilmot's son. (*b*) These oats were received in the ordinary course of prior dealings between the parties, and Wilmot swears that he heard nothing of oats being shipped for Adee, until after they

Adee *v.* Demorest.

were shipped; and hence no consent to the shipment in Adee's name was obtained from him. (*c*) The moment the oats was placed on board, the defendants acquired a special property therein, and the mere making of a bill of lading by Hollister, in the name of Adee, could not divert that property. The bill of lading was made out after the property was placed on board. (*d*) Hollister had no authority from Wilmot to ship the oats in Adee's name, and the plaintiff can acquire no right from the unauthorized act of Hollister. (*e*) The plaintiff is not a *bona fide* purchaser; he advanced nothing upon the cargo or the shipping bill. The defendants did advance upon the faith of the consignment: therefore their equities, as well as legal rights, are superior and paramount to any alleged claim of the plaintiff. 6. The mere fact that property is shipped in the name of a person, was not, at common law, nor is it by the statute relating to factors, conclusive, or scarcely *prima facie*, evidence that such person is the owner. The facility with which frauds at common law could be perpetrated, by a shipment in the name of a person who was not the owner, and his procuring advances thereon, and then the true owner asserting his title to the property, led to the passage of the various statutes, in England and this country, in respect to the consignment of property. Hence our statutes (*Laws of* 1830, *p.* 203, § 2) provide that every person in whose name merchandise is shipped, is to be deemed owner so far as to entitle a consignee without notice to a lien for money advanced, or negotiable security given, by such consignee, to or for the use of the shipper, or for money or negotiable security received by the shippers to the use of such consignee. It will be seen that this statute merely limits ownership in the shippers to the extent of protecting a *bona fide* consignee for advances &c. made by him, and does not declare, as claimed before the referee, (and as necessarily found by him,) that the bill of lading was conclusive evi-

dence of ownership.  But who were the shippers in fact in the case?  It cannot be pretended that Adee was the shipper.  On the contrary, it is undisputed in the case, that Wilmot, or at the most, Wilmot & Hollister, were the shippers.  Hollister, in the shipment, used fraudulently another man's name as consignor.  We insist that, under either of the provisions of the statute before referred to, as well as upon general principles, the defendants had a lien upon the property for their advances to the shippers in fact, and that the receipt or memorandum made by Hollister did not change the title to the grain.  (*Holbrook* v. *Wight*, 24 *Wend.* 169.  *Blossom* v. *Champion*, 37 *Barb.* 554.)  The paper signed by Hollister was in no sense a bill of lading.  (4 *Denio*, 323.  3 *Sandf. S. C. Rep.* 7.  28 *Barb.* 157.)  It was not signed by the master of the boat.  It was not delivered to Adee, and it appearing in the case that the property shipped was not the property that the plaintiff delivered at the warehouse, but was grain bought with the defendants' money, and for them, the referee should have held and decided that the mere fact of Hollister's making a memorandum that he shipped, in the name of Adee, 3880 bushels of oats, did not transfer to Adee, or change the title to, the grain.

III.  1. The referee erred in excluding proof offered by the defendants, viz., to prove the arrangement &c. under which the defendants accepted and paid the drafts in question.  This is the essence of the defendants' claim to the grain.  Wilmot buying this grain for the defendants under an agreement to send it to them to indemnify them for their acceptances, the moment that Wilmot got possession it became the possession of the defendants.  (24 *Wend.* 169.)  It was therefore material to prove the whole arrangement in order to show the right of the defendants to the grain, and when the right to have the grain delivered appeared, to submit that such right was paramount to any claim alleged by the plaintiff.  2. It was error in the referee to

admit the paper claimed to be a bill of lading. It was not admissible for any purpose. It does not purport to be the shipping bill, or even a copy of it. It is a mere memorandum of Hollister; when made, does not appear. That it is not the bill of lading is evident; that the witness testified that he did not know what had become of it, and that he kept no duplicate. And it is upon this paper that the referee must have found that the oats were shipped in the name of Adee. 3. The referee admitted proof, under objection, as to the person for whom the oats were shipped. The bill of lading is the best evidence of who the consignor is; and as one was shown to have been given, that should have been produced, or its loss accounted for. In any view of the case, it became a very material question as to the name of the consignor in this bill of lading. If Wilmot was the consignor, under the proof, it can hardly be pretended that this action can be maintained, although Adee might have been the owner and directed the shipment. Adee's claim is founded entirely upon the fact that he was the consignor. In the plaintiff's view of the case, the rights of these parties would, in a great measure, depend upon who was the consignor, not in fact, but as expressed in the bill of lading. The primary proof, therefore, is the shipping bill itself, which should have been produced. 4. The exception in folio 45 is well taken. Hollister had sworn that Wilmot had told him the 1253 bushels of oats "were ready," and he *supposed* they were put on board, and upon that supposition he made out a shipping bill. It became a material inquiry whether Wilmot had put the oats on board. Hollister had no personal knowledge of the fact, and he was permitted by the referee to swear that Wilmot told him they were thus shipped. This is a violation of the plainest rules of evidence. The fact could not be proven by Wilmot's declarations. 5. The exception in folio 84 is well taken. It was competent to show that the

defendants had no notice of any claim to the oats by Adee, either by the shipping bill or otherwise, and as the referee allowed proof that Adee's name was used as consignor, it was proper to show that there was nothing upon the bill of lading indicating a claim of ownership by Adee. It was proper for another reason, viz., that if these oats were consigned in the usual mode to the defendants upon Wilmot's boat from the Seneca lake, under the agreement proved, and sought to be proved, and upon the receipt of the cargo, in ignorance of any claim by the plaintiff, and in the supposition that the consignment was the same as it had been for several years prior thereto, the cargo was sold by the defendants, with the other proof in the case, it was competent, as bearing upon the question, whether there was a conversion of the grain by the defendants. 6. The referee erred in allowing Henry Wilmot to swear that the oats were shipped in Adee's name, for the reasons before stated. Why was not the shipping bill produced, or notice given to us to produce it? Ordinarily it would not make much difference as to the name of a party in a paper, but under the statute relating to factors it is very material, and hence the necessity of the production of the shipping bill, and it was a palpable error of the referee to allow parol evidence of its contents in such a vital part.

IV. That the oats rightfully came to the possession of the defendants, and that they had lawful right to sell, is not disputed. The complaint, as well as the finding of the referee, is that the defendants converted the proceeds of the sale. The questions are, to whom did the proceeds belong? and, was there a conversion of such proceeds? The first question has been considered. The referee finds that after the sale, the proceeds were demanded of the defendant. There is no evidence whatever of any demand or refusal. Before the action can be maintained, such demand must be proved.

Adee *v.* Demorest.

*D. B. Prosser,* for the respondent. The only question in issue under the pleadings is the ownership of the oats; the defendants by their answer having admitted the sale of the oats and the shipping thereof, as alleged in the complaint, but alleged that the oats belonged to Wilmot or Wilmot & Hollister.

I. The referee is fully sustained in the facts and conclusion of law found by the pleadings and evidence. The only material fact put in issue by the answer is the ownership of the oats; the defendants by their answer allege that the oats belonged to Wilmot or Wilmot & Hollister, and not to the plaintiff. The shipping the oats as mentioned in the complaint, and the receipt and sale thereof by the defendants, are admitted by their answer. The referee having found that the oats belonged to the plaintiff, as one of the facts found by him, his finding is conclusive unless clearly contrary to evidence. The testimony of A. Hollister and the plaintiff fully sustains the referee in his finding that the oats belonged to the plaintiff. The plaintiff at the time the oats were shipped had in store with Hollister 3880 bushels of oats, including the 1253 bushels lent to Wilmot in May, 1863. When the plaintiff called upon Hollister, the warehouseman, for his oats, the oats in question were put on board the boat for him, and shipped in his name, by Hollister, as directed by the plaintiff. Wilmot testifies that Hollister was interested with him in all the oats shipped in 1863. Hollister was the acting man—took charge of the business. It is wholly immaterial whether the 1253 bushels were lent to Wilmot or Wilmot & Hollister. Wilmot testifies that the oats were shipped by the company in July, 1864; that is, by himself and Hollister. Wilmot in his evidence does not claim the oats as belonging to him. On the contrary, he testifies that the boat belonged to him and Hollister, and the oats were shipped by the company. If Hollister and Wilmot were in company and jointly interested in the oats

and in the boat upon which they were shipped, Hollister, the acting man, having shipped the oats in the name of the plaintiff, on account of that quantity being in store or received in store for the plaintiff, they certainly could not, after that, claim the oats or the proceeds arising from their sale. As between the plaintiff and Wilmot, or Wilmot and Hollister, the plaintiff's title to the whole of the oats was perfect and complete. The defendants, not having parted with any thing upon belief that the oats belonged to Wilmot or Wilmot & Hollister, are in no better condition than Wilmot & Hollister would have been in case they had sold the oats and received the pay.

II. The referee's rulings on the hearing, on the receipt and rejection of evidence, was not erroneous, and none of the exceptions taken to his rulings can be sustained. 1. The shipping bill was rightfully received in evidence, It was competent for the plaintiff to prove when and in whose name the oats were shipped. It may not have been absolutely necessary to make the proof, inasmuch as the shipping of the oats, alleged in the complaint, is admitted by the answer. It certainly could not prejudice the defendants to prove what they had admitted. 2. The evidence in relation to the lending and return of the 1253 bushels of oats was part of the evidence which tended to prove the plaintiff's title to the oats. 3. The referee was clearly right in refusing to limit the inquiry on the part of the plaintiff to the oats actually on hand or in store belonging to the plaintiff at the time of the shipment, in July, 1864. Such limitation would have excluded the 1253 bushels returned by Wilmot for those lent in 1863. 4. Wilmot & Hollister owned the boat on which the oats were shipped, and the shipping was done by Hollister. It was therefore clearly competent for the plaintiff to prove by Hollister for whom he shipped the oats. The shipping bill had been proven and given in evidence. The evidence did not tend to contradict the shipping bill, and therefore

could not affect the defendants, even if it were unnecessary.
5. The evidence in relation to the return of the 1253
bushels, and what Wilmot said to Hollister about having
part of them on his boat, was properly received in evidence.
It was a part of the *res gestœ* of the transaction relating to
the return of the oats lent to Wilmot. 6. The referee
was right in overruling the objection to the question put
to Hollister by the plaintiff, whether he, (Hollister,) after
having been told by Wilmot that he had put the oats on
the boat, informed the plaintiff that he had shipped them.
After the plaintiff had applied to the witness to ship the
oats, it most clearly was competent for the plaintiff to
prove by Hollister that he (Hollister) informed him that
he had shipped them. 7. Any agreement or understand-
ing had or made between the defendants and Wilmot prior
to the shipping of the oats in question by the plaintiff,
cannot in any way affect the rights of the plaintiff. The
evidence of the agreement between the defendants and
Wilmot was properly rejected by the referee. Proof of
the agreement could not tend to show that Wilmot or
Wilmot & Hollister were the owners of the oats in question.
The only proper inquiry was as to who owned the oats in
question. 8. It was wholly immaterial whether the oats
which came into the possession of the defendants in the
course of their business with Wilmot were paid for by the
defendants or not. The referee was correct in sustaining
the objection made by the plaintiff. The question was not
whether the oats had been paid for, but it was, who was
the owner? Proof that the defendants had paid for the
oats would not have tended to show whether Wilmot or
the plaintiff owned them. 9. The reason why the defend-
ants accepted and paid the drafts drawn upon them by
Wilmot was wholly immaterial. The accepting and pay-
ing the draft by the defendants would not tend to prove
that Wilmot or Wilmot & Hollister owned the oats, as
alleged in the answer. The referee therefore was right in

sustaining the objection to the evidence. There was no evidence given or offered which tended to prove that the oats in question, or any part of them, were paid for with the proceeds of the drafts drawn by Wilmot upon the defendants and accepted and paid by them. 10. The supposition and belief of the defendants, at the time they received and sold the oats, was wholly immaterial. Their supposition and belief did not tend to prove who owned the oats. The evidence of their supposition or belief was properly rejected by the referee. The defendants did not claim or pretend that they had parted with any thing upon the receipt of the oats, and even if they had, that would not affect the right of the plaintiff, as the shipping bill informed them that the oats belonged to the plaintiff. 11. The question whether the oats were received and sold by the defendants, and the proceeds applied in the business with Wilmot in ignorance of the plaintiff's claim, was immaterial to the issue. Their ignorance of the plaintiff's claim would not tend to prove that he was not the owner. Proof that the oats had been received and sold in ignorance of the plaintiff's claim would not in the least affect the plaintiff's right or title to the oats, or tend to prove that Wilmot owned them. 12. The witness Hollister was not bound to state how he had testified on a former occasion. The referee therefore properly ruled that he was not bound to answer the question as to how he testified in 1862. (*The People* v. *Bodine*, 1 *Denio*, 281. *Mitchell* v. *Hinman*, 8 *Wend.* 667.) 13. The declaration of Hollister to the witness Henry Wilmot was properly excluded by the referee. His declarations were not evidence against the plaintiff. They could only be resorted to for the purpose of impeaching Hollister, after the question had been put to him and answered, and then only when it related to a material point. 14. It was competent for the plaintiff to ask the witness Henry Wilmot, on his cross-examination, after he had testified that at the time of the shipment of the oats, " he

Adee *v.* Demorest.

had no knowledge that the plaintiff had any claim or interest in the oats, except what he derived from Hollister," whether the shipping bill did not show that the oats were shipped in Adee's name. The objection to the question was properly overruled and the answer received. The answer could not in any way or manner affect the right of the defendants; it was not for the purpose of proving the contents of the shipping bill that it had been given in evidence. 15. The proof offered by the defendants, by the witness Booth, which was excluded by the referee, was wholly immaterial, and did not in any way tend to prove the issue. It certainly was immaterial how the account of Hollister was made up at the bank, or what items composed the account. It is equally immaterial whether, in the spring of 1864, the bank did or did not discount drafts drawn by Wilmot on the defendants, indorsed by Hollister or Mrs. Hollister. The discounting drafts drawn by Wilmot on the defendants, indorsed by A. Hollister or Mrs. Hollister, would not tend to prove that the oats in question did not belong to the plaintiff, or that they belonged to Wilmot. It was wholly immaterial how many drafts were discounted for Hollister in 1863 and 1864. 16. The referee was right in excluding the examination of Hollister taken in 1862, in the supplemental proceedings. It was wholly irrelevant, and related to matters which had no connection with the oats in controversy in this action, and was taken before any of the oats were delivered by the plaintiff to the warehouse of Hollister. It was taken the 18th of November, 1862, and related wholly to previous transactions.

III. The exceptions to the report of the referee are none of them well taken, because : 1st. The finding of facts by a referee are not the subject of exceptions. 2d. Under the pleadings and facts found by the referee, his conclusions of law are most clearly right and according to law. Any other or different conclusions of law could not be sustained.

*By the Court*, E. DARWIN SMITH, J.   The conclusion of law upon the facts found by the referee is clearly correct. The referee finds as matter of fact that the plaintiff, on the 2d of July, 1864, shipped to the defendants 3880 bushels of oats, the property of the said plaintiff. That the defendants received the oats, sold them for $3225.67, after deducting charges and commissions, and refused upon demand to pay such proceeds to the plaintiff. This · makes out a clear cause of action. The defendants claim that the finding is erroneous in point of fact, and insist that the plaintiff was not the owner of said oats, but that the same were purchased on their account and with their money, and were their property. Upon a judgment rendered by a referee or single judge the court reviews the facts as well as the law, and upon the same principles which govern the review of the verdict of a jury. The plaintiff in this case gave evidence tending to show that the oats in question were his property, and the defendants also gave evidence tending to disprove the plaintiff's case and to show that the oats belonged to them, and to make out a defense to the action. The referee has believed the plaintiff's witnesses and found in his favor upon the facts, and thus by implication has negatived the defense. The report in favor of the plaintiff in such case is not only an express finding upon the facts in his favor, but is in legal effect a finding against the defendants that the defense was not established, and that no *facts* were proved by the defendants which warranted a finding in their favor upon the whole issue. Before we can reverse the judgment rendered by a referee in such a case, we must, upon a review of the testimony, come to the conclusion that his finding upon the facts is against the clear weight of the evidence, precisely as we should hold if the case had been tried by a jury, and their verdict upon the same facts was for the plaintiff, that such verdict was not warranted by the evidence.  The plaintiff clearly shows that the precise

Adee *v.* Demorest. .

quantity of oats mentioned in the report had been delivered by him at the warehouse of Hollister, the shipper, at or before the time of the shipment of such oats, and he produced the shipping bill of said oats, signed by the said warehouseman and shipper, showing the shipment of this quantity of oats on board of a canal boat owned by said Hollister and others, for and on account of the plaintiff's consignee, to the care of the defendants. These facts clearly establish, *prima facie* at least, that the oats in question were the property of the plaintiff, and had been received by the defendants as his consignees or for his use and benefit. Of these oats the defendants clearly proved that 1253 bushels were not in fact the identical oats delivered by the plaintiff to Hollister and placed in store in his warehouse, but were in fact other oats purchased by Wilmot with money obtained upon drafts drawn by him upon the defendants. Upon the proofs the referee was clearly warranted in finding that 1253 bushels of the plaintiff's oats were during the winter of 1863 and 1864 lent to Wilmot and used by him, and that of the oats shipped to the defendants, the same number of bushels were received and taken from Wilmot's oats in return for or repayment of the oats so lent. Upon these facts there is, I think, no reasonable ground of doubt that Hollister & Wilmot were interested in the operation of buying and shipping oats, (Wilmot himself, the defendants' witness, proves this fact,) and that Hollister did, therefore, in borrowing and paying oats in their common business and for their common benefit, bind both parties. I do not see, therefore, why Hollister might not lawfully, with Wilmot's assent, pay these 1253 bushels of oats to the plaintiff, and why he might not lawfully ship them for him, and give and make the bill of lading or shipping bill in the form produced and proved. Certainly the referee might find that such were the facts and such the true transaction.

The only question which remains, therefore, on this point,

is whether the oats in question—these 1253 bushels—were in fact the property of the defendants or of Wilmot. If they were in fact the property of the defendants, Wilmot or Hollister, or both, could not transfer any title in them to the plaintiff, and the defendants have only received their own property. On this point I do not see that the defendants gave, or offered to give, any proof that would have warranted the referee in finding that the title to these 1253 bushels of oats before their shipment was in them. It is not pretended, and was not contended before the referee, that Wilmot was the agent of the defendants for the purchase of the oats; or that Wilmot & Hollister were such agents; or that such oats were purchased on their account as principals; except that they were purchased on an agreement between Wilmot and the defendants that they should be consigned to them. Simons, one of the defendants, was sworn as a witness, and testified that their firm, prior to July and August, 1864, had been doing business with Wilmot, accepting his drafts on the strength of consignments made by him to them. The witness further said that in the beginning, in 1861, "we told Wilmot that the property must be consigned to us, as we would have nothing to do with him unless the property were consigned to us, and he agreed to it." The transactions, it appears, between these parties under this agreement were large, amounting at the time of the trial to upwards of $200,000. But it does not appear from any thing I see in the evidence that there was any agreement for a lien by the defendants upon the property purchased by Wilmot, or that the title should be in them from the time of its purchase; and there is in the evidence nothing to warrant such a finding as matter of fact by the referee. Wilmot drew upon them as he had occasion, purchased produce with the proceeds of the drafts, and sent it to New York consigned to them to meet his drafts. The property was his, and the profits of the speculation were entirely

his, if any were made; the defendants being entitled to retain from the proceeds of the sale of the property when sold the amount of their advances, interest and commissions and expenses. The defendants were mere commission merchants, and received and were to receive the property for sale as such, not as owners, or even as partners. They had no title to the property and no lien till it was consigned to them by Wilmot. Until consignment, in such cases, the lien does not attach. (*Brown* v. *Hodgson*, 2 *Camp.* 36. *Stanton* v. *Eager*, 16 *Pick.* 467.)

I do not see, therefore, how the referee could have found title in the defendants to the oats in question. It follows that the finding that the property was in the plaintiff was not unwarranted by the evidence, and we cannot reverse the judgment on the ground that the referee erred in his findings upon the facts and that his report for the plaintiff is against the weight of the evidence, or against the evidence. The judgment must therefore be affirmed.

Judgment affirmed.

[MONROE GENERAL TERM, September 2, 1867. *J. C. Smith, E. D. Smith* and *Johnson*, Justices.]